IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL ACTION NO. |
| v.    ) | 2:18cr243-MHT |
| ) | (WO) |
| JOSE OCAMPO-GONZALEZ     ) | |

OPINION

Defendant Jose Ocampo-Gonzalez pled guilty to one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. At sentencing, the court sustained objections by Ocampo-Gonzalez to two offense-level adjustments under the United States Sentencing Guidelines sought by the government: a two-level enhancement under Guideline 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance and a three-level enhancement under Guideline 3B1.1(b) for being a manager or supervisor in a criminal enterprise that involved five or more participants or was otherwise extensive. *See* U.S. Sent'g Guidelines Manual under U.S.S.G. §§ 2D1.1(b)(12) and 3B1.1(b) ("U.S.S.G."). After

sustaining these objections, the court granted a small downward variance and sentenced Ocampo-Gonzalez to 120 months of incarceration. The court writes to explain further its findings and reasoning, particularly as to its decisions on these two enhancements requested by the government.

I.

Before and during Ocampo-Gonzalez's sentencing, the parties came to several agreements that narrowed considerably the issues before the court. First, the parties agreed on the converted drug quantity attributable to Ocampo-Gonzalez. *See* Order (doc. no. 658) at 1. Ocampo-Gonzalez also conceded that he should receive a two-level enhancement under Guideline 2D1.1(b)(1) for possessing a firearm during the offense. The government conceded that it had insufficient evidence to show that he had used or threatened violence or that the offense involved importation of methamphetamine, which would each have yielded an additional two-level

enhancement.  *See* U.S.S.G. § 2D1.1(b)(2), and (b)(5)). The government also moved for a three-level downward adjustment based on Ocampo-Gonzalez's acceptance of responsibility.  *See* Motion for Reduction (doc. no. 494) at 1.

With these agreements in place, the remaining issues for the court to resolve at sentencing were whether the government had shown that Ocampo-Gonzalez maintained a premises for distributing drugs, whether he was a manager or supervisor of a criminal enterprise, and whether to grant his motion for a downward variance.

II.

Guideline 2D1.1(b)(12) provides that: "If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance," the base offense should be increased by 2 levels.  The court found that the government had not met its burden of showing that this upward adjustment should apply.

For this guideline to apply, the commentary on the Sentencing Guidelines instructs that: "Subsection (b)(12) applies to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 cmt. n.17. "Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained...." *Id.* Drug distribution must, however, be "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses." *Id.* As the above commentary indicates, "premises" may be an entire property or a subsection of a property, even a single room. *See id.* The sentencing court should determine whether the enhancement applies by assessing "the totality of the circumstances." *United States v. George*, 872 F.3d 1197, 1205-06 (11th Cir. 2017).

From the evidence presented, it was clear to the court that drug distribution was not a "primary or principal use[]" of Ocampo-Gonzalez's property as a whole. He lived on the 20-acre tract and maintained the bulk of it as a farm, growing fruit and vegetables for sale. The drug sales largely took place in a trailer on his property. The evidence reflected that his property was primarily put to lawful agricultural and residential uses; one of his co-defendants referred to the drug deals as a "side gig" to his farming business. The court therefore found that Ocampo-Gonzalez's drug transactions in the trailer were an "incidental or collateral" use of his property as a whole.

Whether drug distribution was a "primary or principal" purpose of the trailer alone was a closer question. To determine whether drug distribution is a "primary or principal" use of a premises rather than an "incidental or collateral" one, the Sentencing Guidelines instruct that a court "should consider how frequently the premises was used by the defendant for manufacturing or

5

distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." U.S.S.G. § 2D1.1 cmt. n.17.  In other words, the court should, if possible, compare how often the premises are used for licit and illicit activities to decide whether the illicit purposes are a sufficiently significant component of the property's overall use to be a "primary or principal" purpose of the space.

The government's evidence demonstrated that most of the drug transactions for which Ocampo-Gonzalez was indicted took place in the trailer.  But the government agreed that it had presented no evidence showing the lawful purposes to which the trailer was put.  In effect, the government argued that, because it had provided evidence of only the times when the trailer was used unlawfully, the court should assume that the trailer was never put to lawful use when it compared the frequency of the trailer's licit and illicit uses.

The government read its evidence for more than it was worth.  To be sure, a comparison of how often the

6

premises are used for licit and illicit activities is not the only way to establish that the premises were used for an illicit purpose. Circumstantial evidence can come in many forms. For example, one might reasonably extrapolate from the daily use of a premises for an illicit purpose over a period of time that this purpose was "primary or principal" rather than an "incidental or collateral." In other words, the degree of use for an illicit purpose may, by itself, be telling. Here, however, the evidence was insufficient to convince the court that the use of the trailer for drug distribution was of such frequency to reflect that that use was a "primary or principal" purpose of the trailer.

In addition, evidence of the content of the trailer could have been telling. Evidence of whether someone lived there *or not*, or used the trailer as part of the farming operation *or not*, could have been helpful in the court's determination of whether the drug distribution that occurred there was "primary or principal" rather than "incidental or collateral." That is, evidence of

7

what was in the trailer, as well as evidence of what was not, could have been relevant. The record lacks such evidence.

Looking at the totality of the circumstances, the court was not convinced by the evidence the government presented that Guideline 2D1.1(b)(12) should apply.

### III.

The court also found that the government had not carried its burden under Guideline 3B1.1(b).

This guideline, according to its introductory commentary, provides for an upward "adjustment based upon the role the defendant played in committing the offense." U.S.S.G. § 3B1.1 introductory cmt. The guideline specifically states: "If the defendant was a manager or supervisor ... and the criminal activity involved five or more participants or was otherwise extensive,"

increase the base offense level by 3. U.S.S.G. § 3B1.1(b).[1]

"The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1 cmt. background. The Commission explained that: "This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the

---

[1]. Guideline 3B1.1(b) is part of a broader guideline that provides for three different levels of adjustments for a defendant's "aggravating role" in an offense. Guideline 3B1.1 provides in full:

> "(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> "(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> "(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels."

commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate." *Id.*

Ocampo-Gonzalez conceded that the criminal enterprise of which he was a member was extensive enough to meet the second element of this enhancement: "the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). The question for the court was whether he had a managerial or supervisory role in the enterprise.

In *United States v. Rodriguez*, 805 F. App'x 773 (11th Cir. 2020), the Eleventh Circuit Court of Appeals recently confronted the issue of whether a defendant was a manager or supervisor under Guideline 3B1.1(b). While that case is not binding, it is instructive in assessing a defendant's *role* in committing an offense. The appellate court began by noting that: "The commentary to the Guidelines directs a court, in assessing a defendant's role, to consider the following factors: (1) whether he exercised decision-making authority, (2) the

nature of his participation in the commission of the offense, (3) whether he recruited accomplices, (4) whether he claimed a right to a larger share of the fruits of the crime, (5) his degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority he exercised over others." *Rodriguez*, 805 F. App'x at 777 (citing U.S.S.G. § 3B1.1 cmt. n.4). "This multi-factor analysis requires a district court to decide on a 'case-by-case basis,' under the totality of the circumstances, whether the enhancement should apply." *Id.* While "[t]here is no requirement that all the considerations have to be present for the enhancement to be applied," *id.*, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2; *see also United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009).² Indeed, depending on the circumstances, "the

---

2. Although the commentary to the Sentencing Guidelines presents these factors as distinguishing defendants who are "organizer[s]" or "leader[s]" under

11

assertion of control or influence over only one individual is enough to support" this enhancement. *United States v. Jiminez*, 224 F.3d 1243, 1251 (11th Cir. 2000).

The government's theory was that this guideline applies because Ocampo-Gonzalez exerted sufficient control over several of his co-defendants and his nephew, apparently named Carlos, who has not been charged but was allegedly present during some of Ocampo-Gonzalez's drug sales. As to his co-defendants, the government's evidence fell considerably short of the mark. The evidence convincingly demonstrated that Ocampo-Gonzalez

---

Guideline 3B1.1(a) from those who are "manager[s]" or "supervisor[s]" under Guideline 3B1.1(b), U.S.S.G. § 3B1.1 cmt. n.4; *see also supra* note 1, this court, as did the court in *Rodriguez*, still views them as, on their face, instructive in determining "the role the defendant played in committing the offense," U.S.S.G. § 3B1.1 introductory cmt., and, thus, in determining from a "totality of the circumstances," *Rodriguez*, 805 F. App'x at 777, the applicability of Guideline 3B1.1(b). To be distinguishing factors, they would all still need to address the issue of the defendant's role in the criminal activity, and, in particular, whether the defendant was a "manager" or "supervisor" under Guideline 3B1.1(b).

supplied his co-defendants with cocaine and marijuana for them to resell or otherwise distribute. It did not demonstrate that he ever asserted authority or control over them. Typifying the government's argument, it claimed that Ocampo-Gonzalez acted as a manager of one of his co-defendants because when the co-defendant said that he was thinking about moving to North Carolina, Ocampo-Gonzalez tried to convince him to stay in Alabama. This showed nothing more than a business relationship between a buyer and seller; Ocampo-Gonzalez didn't want to lose a good customer and so attempted to talk him out of leaving. The court was not convinced that this relationship involved any degree of control or authority by Ocampo-Gonzalez. *See United States v. Glinton*, 154 F.3d 1245, 1260 (11th Cir. 1998) (noting in reviewing a Guideline 3B1.1(c) enhancement based on the defendant's "managerial role" that "[a] mere buyer/seller relationship is not a sufficient basis to assess a managerial enhancement"); *see also United States v. Jenkins*, 742 F. App'x 455, 457 (11th Cir. 2018) (citing

13

*Glinton* for this proposition in reviewing a Guideline 3B1.1(b) enhancement); *Jiminez*, 224 F.3d at 1251 (Defendant "correctly notes that being a drug supplier does not automatically make him a 'supervisor' under the Guidelines.").

The government's evidence as to Ocampo-Gonzalez's relationship with Carlos also fell short. The bulk of the government's evidence as to Carlos's role in the sales came from the testimony of a single witness. And while that witness testified that Carlos was present for some of the sales, carried a firearm, and from time to time helped weigh or package the drugs, the evidence was insufficient as to the nature of the relationship between Ocampo-Gonzalez and Carlos. That is, the evidence did not show whether Ocampo-Gonzalez directed Carlos to carry the firearm or to package the drugs, or generally whether either of the two men was, in any substantial measure, in charge of the other during the transactions or were essentially co-equal partners.

14

Moreover, that a person in his interaction with another person may, at times, direct the other to do something is not necessarily indicative of control or authority--and, in particular, as to the criminal activity at issue. The giving of a direction may be merely incidental or casual to the relationship and not indicative of the overall relationship, and, in particular, it may not show that one person was in charge of or exercised authority over another in the criminal activity. The "degree of control and authority," as well as their nature, is important. U.S.S.G. § 3B1.1 cmt. n.4. There was no evidence of the overall relationship between Ocampo-Gonzalez and Carlos.

In any event, the witness the government relied upon as to Carlos's involvement was not credible. The witness gave sharply divergent explanations of his history of drug use to the probation officer, and, on the stand at Ocampo-Gonzalez's sentencing, he claimed that a notebook full of names and dollar amounts, which he had previously told drug enforcement officials was a drug ledger, was

15

in fact just a list of people who owed him money for a variety of benign reasons: cars he supposedly gave them on credit or wedding receptions he catered. The court did not credit anything the witness said about Carlos or otherwise.

Finally, the court turns, as it must, to the totality of the circumstances. After carefully considering the seven factors listed above, and, for all of the above reasons, separately and together, the court is not convinced that the Guideline 3B1.1(b) enhancement should be applied here. The court finds that Ocampo-Gonzalez's role was essentially that of only a buyer and seller, and that, in that role, he was not a manager or supervisor.

IV.

Pursuant to the parties' agreement as to the amount of drugs attributable to Ocampo-Gonzalez, the court found that his base offense level was 32. The court adjusted upward two levels because Ocampo-Gonzalez admitted that he possessed a firearm during the offense, and it

adjusted downward three levels per the government's motion due to his acceptance of responsibility.  This resulted in an offense level of 31.  Ocampo-Gonzalez's criminal history category was II, yielding a guidelines range of 121-151 months.

The statutory minimum term of imprisonment for Ocampo-Gonzalez's offense was 120 months.  The court granted his motion for a variance and varied downward to 120 months, one month below the guidelines range, because it believed that this sentence, along with the fact that Ocampo-Gonzalez will be deported after he is released, was sufficient punishment for his crime in light of the factors in 18 U.S.C. § 3553(a).  The court believed that Ocampo-Gonzalez's deportation will be a very severe punishment given his decades-long presence in the country--he is 51 years old and first came to the United States as a teenager--as well as his extensive family ties here, including his wife and young children who were present at sentencing.  The court found that 120 months of incarceration before his deportation was sufficient

17

**but not greater than necessary to reflect his circumstances and the seriousness of his offense.**

**DONE, this the 1st day of December, 2020.**

                                                        /s/ Myron H. Thompson
                                        **UNITED STATES DISTRICT JUDGE**